Rel: May 17, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

_____

### CL-2023-0561

_____

## J.L.W.

## v.

## C.J.P.

### Appeal from Jefferson Juvenile Court
### (CS-22-900165)

FRIDY, Judge.

J.L.W. ("the mother") appeals from a judgment of the Jefferson Juvenile Court ("the juvenile court") awarding her and C.J.P. ("the father") joint legal and joint physical custody of their child, R.W. ("the child"). She also challenges several other provisions of the juvenile court's

judgment, including the provision directing that the child's last name be hyphenated to include the father's surname, the provision directing that the mother be responsible for maintaining the health-insurance coverage for the child, and its failure to establish "tiebreaker" authority as between the parents regarding decisions concerning the child's medical care and his academic, religious, cultural, civic, and athletic activities. For the reasons discussed herein, we affirm the judgment in part, reverse it in part, and remand the cause to the juvenile court.

Background

The child was born in May 2015 to the mother and the father, who have never been married to each other. On March 1, 2022, the father filed a petition to establish paternity in the Jefferson Juvenile Court in which he sought legal and physical custody of the child and asked that the child's surname be changed to his surname. On March 23, 2022, the mother filed an answer and a counterclaim in which she, too, requested "primary" custody of the child, as well as child support. Before the trial, the father submitted to genetic testing. The results of that testing indicated that his probable paternity was 99.99%.

The juvenile court held a trial over two days in December 2022 and April 2023. Much of the evidence that the juvenile court received was conflicting. The mother testified that she and the father were dating when the child was conceived. She acknowledged that, when she learned that she was pregnant with the child, she received a text message from another man saying that he believed that he was the child's father. She said that the father did not immediately accept that he was the child's biological father, and she said that she could not recall whether the father began sending her baby supplies once the child was born.

The mother said that the father asked her to put his name on the child's birth certificate but that she did not recall when he first made the request. The father testified that he attempted to have his name added to the child's birth certificate in 2015. The child's last name was the mother's maiden name, but when the trial took place, she was married and no longer used that name. The mother's parents also did not have the same last name as the child. The mother acknowledged that, although the child's sibling shared the last name of the mother and her husband, T.V. ("the husband"), the child did not. However, she said, others in her family had the same last name as the child.

The father was in school in Orlando, Florida, when the baby was born. He testified that, at that time, he and the mother were no longer in a romantic relationship. When he finished school in January 2017, the father said, he returned to Birmingham but was unable to find a job in his field, so he joined the military. He said that he registered the child as a dependent and enrolled him in benefits to which he was entitled. Upon his enlistment, the father said, he provided the mother with a TriCare card, which served as health insurance for the child, although no court had required him to do so. The father testified that, after his training period ended, he began regularly sending the mother money for the child's benefit. The mother said that she received only sporadic financial support from the father.

While the father was stationed outside of Alabama, the mother said, his mother ("the paternal grandmother") spent time with the child, taking him on Wednesday nights and on some weekends.[1] The father said that, while he was gone, the paternal grandmother had regular visitation with the child every other weekend and at other times as well. When he

---

[1]In her brief, the mother refers to times when the father was stationed in Tennessee; however, as the father points out, no evidence was presented indicating that he was ever stationed there.

returned to Alabama on leave, the father said, he would spend most of his time with the child.

The mother said that while the father was in the military, she would take the child to visit him. For example, she said, she took the child to Fort Benning, Georgia, to visit the father for Thanksgiving in 2017. In July 2018, the child went with the father to a family reunion in North Carolina. When the father left the military in 2020, he said, he returned to Birmingham and began seeing the child every other weekend.

After the child was born, the mother and the child lived with the mother's mother ("the maternal grandmother") in Vestavia. The mother testified that, in March 2019, when the child was three or four years old and she was nineteen years old, she married the husband. In April 2019, they moved to Tennessee, and the father and the paternal grandmother would visit the child. The father took the child to the beach for a week in December 2019. The mother and the father agreed that they had had a cordial relationship throughout his time in the military and, indeed, had enjoyed that relationship up until there was a confrontation between her stepfather ("the maternal step-grandfather") and the father in January 2022.

In March 2020, the mother and the husband had a child ("the sibling"). The father said that, when the mother was pregnant with the sibling, she told him that her marriage to the husband was "rocky." He also said that the mother "hit on" him and sent him suggestive photographs of herself. The mother explained that, when she sent the father the photographs, she was at a low point and that her marriage was in what she called "a light patch." At the time of the trial, though, the mother said that her marriage with the husband was "great."

The mother said that she, the husband, and the children, who she described as inseparable, moved back to Alabama from Tennessee, once again living with the maternal grandmother, but that she "really ha[d] no idea" when that move took place. She first indicated it was in October 2019, then changed her response to October 2020. They moved back to Alabama because the husband was promoted, she said.

When the mother, the husband, and the child moved back to Alabama, the mother said, the father resumed seeing the child at least every other weekend, and the father took the child to the beach again in December 2020. She said that the father was involved in Boy Scouts with the child and, through the Scouts, took the child camping overnight. The

father testified that from 2020 until the litigation began, he saw the child every other weekend. He also attended the child's extracurricular activities, including the child's karate classes and Cub Scout events; they would talk on FaceTime regularly; and, they took vacations together.

In April or May 2021, the mother, the husband, and the sibling moved to South Carolina because of the husband's job. The mother said that they left the child with the maternal grandmother so that he could finish the schoolyear. The mother testified that it was more important for her to leave the child with the maternal grandmother for two weeks so that she could unpack and have his room ready for him than to wait for him to finish school before going. During the summer, when the child was in South Carolina, the father came to visit, the mother said. She said that she did not recall whether the father wanted to have the child for summer visitation, but, regardless, she did not let the child go with the father for a visit during the summer of 2021.

In August 2021, the mother said, she returned the child to live with the maternal grandmother in Alabama because, she said, she did not believe that the schools in South Carolina were adequate. She returned to South Carolina with the husband and the sibling but, she said, the

family never intended to stay there permanently. The mother said that she mentioned the child's return to Alabama to the paternal grandmother but that she did not tell the father because, she said, when the father and the child were "on FaceTime," she heard the child tell the father that he was returning to Alabama.

The father testified that he first learned that the child had returned to live at the maternal grandmother's house in Vestavia when he asked the mother if he could FaceTime or talk on the phone with the child. The mother responded that he would have to contact the maternal grandmother because the child was living with her again. He said that he talked with the maternal grandmother so that he could resume his regular visitation schedule with the child, but she denied him visitation for a few weeks, until the end of August, when Cub Scouts started. At that time, the father said, he and the child returned to doing what he said were their "regular activities."

While the mother was living in South Carolina without the child, the father and the paternal grandmother asked if they could have the child for a week at Christmas. The mother said that she refused that request because, at that time, they were seeing the child more than she

was and she would be in Birmingham to see him. The father testified that, while the mother lived in South Carolina, she told him that she was deferring to the maternal grandmother's decisions regarding visitation. The mother, however, denied that she had told the father that he would have to arrange visits with the child through the maternal grandmother.

The mother said that the maternal step-grandfather and the father had a confrontation in January 2022. The father testified that, on the occasion of that confrontation, he had gone to the child's karate class and "noticed that things seemed to be a little off." He said he approached the maternal step-grandfather to ask whether everything was okay, and the maternal step-grandfather "pretty aggressively" made accusations against him that he said were not true. The father said that he asked the maternal step-grandfather whether the child had seen a doctor, but the maternal step-grandfather did not respond. The father said he was "extremely concerned" about the child and reached out to the mother, who initially spoke with him on the phone. He said that, after that initial contact, the mother did not respond to him again for two weeks. In the texts and voice messages he left for the mother during that interim, the father said, he told the mother that the maternal grandparents were no

longer communicating with him and that he wanted her to help him address those issues.

The mother testified that, in January 2022, the father sent her a text message asking her to return to Alabama so that they could deal with an issue the child was having. She said that she responded to the father, saying that the child's issues, including bedwetting, did not alarm her. She said that living away from the child with the sibling and the husband were not the cause of the child's problems, adding that that thought "absolutely did not" cross her mind. The mother returned to Alabama the second week of February 2022, when, she said, she was served with papers regarding this case.

The juvenile court asked the mother why the child was receiving therapy. The mother said she thought "he was being groomed or had been sexually -- something sexually [sic] had happened" with the father or someone at the house where the child was staying. The juvenile court asked the father's attorney to respond, and she said that the mother knew the allegation was not true. She added that the child was urinating and defecating in the bed and that the father was concerned that the problem arose because the mother was living in another state while the

10

child lived with the maternal grandparents. She also observed that the mother had agreed to allow the father to have unsupervised overnight visits with the child.

The father told the juvenile court that he was asking for the parents to share custody of the child every other week and to be able to FaceTime with him regularly without interference from the mother. He also said that he would like for the child to have his surname. The father said that he lived less than ten minutes from the child's elementary school in Vestavia, but, in the past, the mother had not allowed him to pick up the child from school or to go to the school. He said that she had also failed to advise the father of the times for some of the child's extracurricular activities. He told the juvenile court that he would like access to the school and to the schedule of the child's extracurricular activities.

The mother told the juvenile court that she would like both legal and physical custody of the child and that she wanted to keep her maiden name as his last name. She testified that the child knew his last name and could read and write that name, that the child's school and medical records and awards were in that name, and that she thought he would be confused if his last name were changed. She also requested child support.

After the first day of testimony, the juvenile court entered an order on December 20, 2022, adjudicating the father's paternity and establishing a Christmas-visitation schedule. On April 28, 2023, the juvenile court entered a judgment finding that the mother and the father had both been involved in the child's life and that both were "equally able to provide love, care, nurturing and stability" to the child. Based on that finding, it awarded the mother and the father joint legal and joint physical custody, rotating physical custody week to week. The juvenile court also established a holiday and school-vacation schedule for the parents to follow. Additionally, the juvenile court ordered that the mother to continue to provide health-insurance coverage for the child and directed the parties to equally divide all noncovered medical expenses, including, but not limited to, dental, orthodontic, and optical care expenses incurred on behalf of the child. It also ordered that the father's last name be added to the child's as a hyphenated name, making the child's last name W.-P.

The mother filed a motion to alter, amend, or vacate the judgment and a motion to stay the judgment on April 30, 2023. The juvenile court

12

denied both motions on May 3, 2023. The mother appealed to the circuit court and ultimately to this court.

## Standard of Review

When a juvenile court makes a custody determination based on ore tenus evidence, its findings in support of that determination are accorded a presumption of correctness on appeal. Ex parte Bryowsky, 676 So. 2d 1322, 1324-26 (Ala. 1996). An appellate court will not reverse the juvenile court's custody judgment "unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow." Phillips v. Phillips, 622 So. 2d 410, 412 (Ala. Civ. App. 1993).

## Analysis

The mother first contends that the trial court erred in awarding the parties "equal legal and physical custody" and an every-other-week custody schedule, calling the custody change "drastic."

Because there had been no previous court order concerning the custody of the child, the April 28, 2023, judgment constituted an initial

custody determination. In <u>Steed v. Steed</u>, 877 So. 2d 602, 604 (Ala. Civ. App. 2003), this court explained that, when a trial court makes an initial custody determination, neither party is entitled to a presumption in his or her favor. The trial court must decide what custody arrangement is in the best interests of the child. <u>Steed</u>, 877 So. 2d at 604. To determine the child's best interests, trial courts are to consider a number of factors, including but not limited to, the age and sex of the children,

> "the characteristics and needs of each child, including their emotional, social, moral, material and educational needs; the respective home environments offered by the parties; the characteristics of those seeking custody, including age, character, stability, mental and physical health; the capacity and interest of each parent to provide for the emotional, social, moral, material and educational needs of the children; [and] the interpersonal relationship between each child and each parent,"

as well any other relevant matter the evidence demonstrates. <u>Ex parte Devine</u>, 398 So. 2d 686, 696-97 (Ala. 1981).

In 1996, after <u>Devine</u> was decided, our legislature made clear that, when deciding issues of child custody after parents separate or divorce, "[i]t is the policy of this state to assure that minor children have frequent and continuing contact with parents who have shown the ability to act in the best interest of their children and to encourage parents to share in

the rights and responsibilities of rearing their children." § 30-3-150, Ala.

Code 1975. Thus, in every case involving custody, the trial court must

consider whether to order joint custody, and,

> "[i]n determining whether joint custody is in the best interest of the child, the court shall consider the same factors considered in awarding sole legal and physical custody and all of the following factors:
>
> > "(1) The agreement or lack of agreement of the parents on joint custody.
> >
> > "(2) The past and present ability of the parents to cooperate with each other and make decisions jointly.
> >
> > "(3) The ability of the parents to encourage the sharing of love, affection, and contact between the child and the other parent.
> >
> > "(4) Any history of or potential for child abuse, spouse abuse, or kidnapping.
> >
> > "(5) The geographic proximity of the parents to each other as this relates to the practical considerations of joint physical custody."

§30-3-152(a), Ala. Code 1975.

In support of her contention that an award of joint physical custody

is not in the child's best interests, the mother asserts that the child had

lived primarily with her since his birth, that she had been responsible for

the child's primary care since his birth, that the parties had been

15

operating under the same visitation schedule for most of the child's life and the child was doing well under that schedule, and that the father did not live in the same school district as the child, who had attended only one elementary school.

As mentioned, the juvenile court found that both parents had been "very involved" in the seven-year-old child's life and were equally able to provide love and care for the child. Evidence indicated that the father took an active role in sharing Cub Scout activities with the child, as well as other extracurricular activities like karate. As the mother noted, the father had regularly exercised visitation with the child and the two had spent vacations, holidays, and extended-family gatherings together. Before any court order was in place, the father provided health insurance for the child and secured benefits for him as a dependent when he was serving in the military. The father also regularly provided financial support for the child for numerous years, again without having been ordered to do so.

When the child was six years old, the mother returned him to Birmingham to live with the maternal grandparents while she, the husband, and the sibling lived in South Carolina. Evidence suggests that,

16

during that time, the mother ceded decisions regarding the child to the maternal grandmother. The child's living arrangement during that time cuts against the mother's assertions that she had been the child's primary caregiver his entire life and her claim that the child and the sibling were "inseparable." The mother also denied that living in a different state than her six-year-old child could have caused that child to resume wetting the bed or the other unspecified problems that the father was told about. Additionally, evidence indicates that, after the January 2022 confrontation between the father and the maternal step-grandfather at the child's karate lesson, the relationship between the father and the mother was not as cordial as it had been, and the mother came to believe that the child was being "groomed" by the father or someone connected to the father. She did not present any evidence to support that belief.

Before the confrontation, the parties agreed, they had been able to cooperate and make joint decisions regarding the care of the child. When the trial took place, the child was enrolled in elementary school in Vestavia, and, the father said, the school was less than ten minutes from his house.

17

Based on the evidence, the juvenile court reasonably could have been convinced that joint legal and joint physical custody, including an every-other-week custody schedule, could be implemented easily and that spending equal time with both parents was in the child's best interests. Nothing in the record suggests that that decision was plainly and palpably wrong. Therefore, the juvenile court's custody award is due to be affirmed.

The mother next contends that the juvenile court erred in changing the child's surname from W. to W.-P. because, she says, the father failed to demonstrate that good cause existed for the name change. Section 26-16-636(e) of the Alabama Uniform Parentage Act, § 26-17-101 et seq., Ala. Code 1975, provides that, in an action to adjudicate paternity, "[o]n request of a party and for good cause shown, the court may order that the name of the child be changed." See also J.M.V. v. J.K.H., 149 So. 3d 1100, 1104-05 (Ala. Civ. App. 2014). In J.M.V., this court reversed the judgment of the trial court changing the child's surname, concluding that "a parent petitioning to change the name of the child must present evidence showing that the change would benefit the child in some positive manner" and that the father, who was seeking the name change, had failed to meet

18

that burden. J.M.V., 149 So. 3d at 1105-06. In support of our holding, we pointed out that, among other things, the child knew his last name as the mother's surname, that all of his records identified him by that name, and, while not dispositive, that "the father waited over three years to establish his paternity, all the while knowing that the child was not bearing his surname and that the child would become accustomed to his given name." Id. at 1106. See also K.G. v. M.E., 355 So. 3d 344, 348-49 (Ala. Civ. App. 2021) (reversing judgment changing child's last name because father seeking name change failed to present evidence that such a change would promote child's best interests).

Here, the mother testified that the child knew his last name and could read and write that name, that the child's medical and school records and his awards were in that name, and that she thought he would be confused if his last name were to be changed. The father elicited evidence demonstrating that the mother, the sibling, and the child's maternal grandparents did not share the child's last name, but he presented no evidence demonstrating that a name change would promote the child's best interests. Although the father argues in his brief that "[t]here was no evidence presented that the change of the minor child's

19

name would have a detrimental effect," this court has previously rejected that argument as sufficient to support a name change, writing that "[a] court may not change the name of a child on the ground that the change would not cause the child any particular detriment." J.M.V., 149 So. 3d at 1106.

Because the father failed to demonstrate that a change of last name would promote the child's best interests, we must reverse the judgment as to this issue. Accordingly, we need not address the mother's contention that the juvenile court erred by not appointing a guardian ad litem to represent the child's best interests regarding the father's request to change the child's last name.

The mother next contends that the juvenile court erred in failing to establish what she called "tiebreaker" authority for the parents in case they are unable to agree on certain decisions regarding the child, including medical decisions and decisions regarding the child's participation in academic, religious, cultural, civic, and athletic activities. In support of her argument, the mother cites § 30-3-153, Ala. Code 1975, which provides that, "to implement joint custody, the court shall require the parents to submit, as part of their agreement, provisions

covering matters relevant to the care and custody of the child," including decisions regarding the child's education, medical and dental care, holidays and vacation time, and religious, civic, cultural, and athletic activities. (Emphasis added.) The statute further provides that, as part of their agreement, the parents are to designate the parent who is to have primary decision-making authority over those decisions, failing which the trial court "shall set the plan." § 30-3-153(b). It is undisputed that the parties did not reach an agreement regarding joint custody in this case, and that the mother had, in fact, opposed joint custody in the juvenile court, just as she does on appeal.

The mother relies on Ford v. Ford, 3 So. 3d 872 (Ala. Civ. App. 2008), to support her argument. In that case, the father had argued that the trial court erred by awarding the parties joint custody of their children without setting out a plan for joint custody, id. at 874, although nothing in the opinion indicates that the parties had agreed to joint custody. This court agreed with the father's argument, relying on § 30-3-153(a) to hold that, "in cases in which joint custody is awarded, a plan for implementing the joint-custody arrangement is required." Id.

Shortly thereafter, however, in <u>Ratliff v. Ratliff</u>, 5 So. 3d 570 (Ala. Civ. App. 2008), this court reached the opposite conclusion. In that case, we declined to reverse a trial court's judgment awarding the parties "shared custody" with "shared parental responsibility" for their minor children based on the wife's argument that the trial court had erred by failing to designate which parent should have final decision-making authority if they disagreed. We explained:

> "§ 30-3-153[, Ala. Code 1975,] applies solely to joint-custody agreements; the parties did not agree to joint custody in this case. Section 30-3-151(2) gives the trial court the discretion to establish a parenting plan when awarding joint custody. <u>See</u> Ala. Code 1975, § 30-3-151(2) ('The court <u>may</u> designate one parent to have sole power to make certain decisions while both parents retain equal rights and responsibilities for other decisions.' (emphasis added))."

<u>Id.</u> at 585.

We cannot reconcile the holding in <u>Ford</u> with the holding in <u>Ratliff</u>. In neither case did the parents agree to a joint custody arrangement, but, in <u>Ford</u>, we determined that the trial court was required to implement a joint custody plan and in <u>Ratliff</u>, we held that it was not. The decision in <u>Ratliff</u> was based on the plain language of § 30-3-153 and § 30-3-151 that, when taken together, provides that when there is no joint-custody agreement between the parents, the trial court has the discretion

22

whether to give one parent the authority to make certain decisions regarding the child's medical, educational, and extracurricular activities, and that only when the parties have entered into an agreement providing for joint custody is the trial court required to ensure the inclusion of a parenting plan in its custody judgment. Today, we conclude that the rationale for the holding in Ratliff is the better reasoned, and we overrule Ford insofar as it is inconsistent with Ratliff.

As noted above, the parties in this case did not agree to joint custody. Thus, the juvenile court had discretion whether to include a parenting plan designating a "tiebreaker" with final decision-making authority regarding the child in its judgment providing for joint custody. In light of the evidence indicating that, before the confrontation between the father and the maternal step-grandfather, the mother and the father were able to work together to make decisions on behalf of the child, we conclude that the juvenile court did not exceed its discretion in declining to do so.

Finally, the mother contends that, in light of its award of joint physical custody, the juvenile court erred in making her solely responsible for maintaining and purchasing health insurance for the

23

child. However, the mother failed to raise this issue at trial or in her motion to alter, amend, or vacate the judgment. It is well settled that an appellate court's "review is restricted to the evidence and arguments considered by the trial court." Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala. 1992). By failing to preserve this issue for appellate review, the mother has waived it. Even if she had preserved it, however, we find no merit to her argument.

The mother contends that, because the evidence showed that the father earned approximately $4,000 per month and that she was a "stay-at-home mother" who was no longer earning an income as a dental assistant, the juvenile court should not have ordered her to continue to maintain health-insurance coverage for the child. The evidence indicated that the mother was already providing health insurance for the child, and she had not sought assistance from the father to cover its cost, nor did she ask the juvenile court during the trial to have the father pay the cost or any portion of the cost of that insurance. Based on the evidence and the mother's argument, we cannot conclude that the juvenile court's order directing the mother to continue to provide the child with health

insurance constituted an abuse of discretion or was plainly and palpably wrong. See Burkett v. Burkett, 367 So. 3d 409, 418 (Ala. Civ. App. 2022).

## Conclusion

For the reasons set forth above, the judgment of the juvenile court is reversed insofar as it ordered a change to the child's last name. The remainder of the judgment is affirmed. The cause is remanded to the juvenile court for it to enter a judgment consistent with this opinion.

The father's request for an attorney fee on appeal is denied.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Moore, P.J., and Hanson and Lewis, JJ., concur.

Edwards, J., concurs in the result, without opinion.